## CHARLES B. ALLYN'S APPEAL FROM COUNTY COMMISSIONERS.

Third Judicial District, Bridgeport, October Term, 1908.

BALDWIN, C. J., HALL, PRENTICE, THAYER and RORABACK, JS.

There is nothing in the Constitution of this State or of the United States which forbids the enactment of a State law licensing the use and sale of intoxicating liquors as a beverage; and in view of the fact that such a law has been one of the permanent features of our State government from 1643 to the present time, it cannot now be successfully maintained that the business of selling liquor to be drunk on the premises is so destructive to public health and morals that the State is powerless to sanction it.

The power of legislation vested by our Constitution (Art. 3, § 1) in the General Assembly covers the whole field of legitimate legislation, except as that may be limited by other provisions of that Constitution or by the Constitution of the United States.

Subject to these exceptions any legislation is legitimate which is not inconsistent with a republican form of government.

The obligation of each State to maintain a "republican form of government" and to observe "due process of law" in the treatment of persons and property, imposed by the Federal Constitution, is not inconsistent with the right of the State either to license and regulate, or to prohibit, the sale of intoxicating liquors.

At common law the business of selling liquors was lawful and open to any man, and our statutes do not enlarge but restrict this right.

In testing the validity of a State license law it is immaterial whether the purpose of the enactment is the regulation of a business or the raising of revenue; although such an inquiry may be relevant in respect to the validity of a license issued by a municipality under legislative authority.

The term "police power" has, at bottom, no other meaning than the general power of governing its people and dominions belonging to every sovereignty.

Submitted on briefs October 30th, 1908—decided January 22d, 1909.

APPEAL by a taxpayer, under General Statutes, § 2660, from the grant by the County Commissioners of Fairfield County of a license to one Morrill to sell intoxicating liquors, brought to the Superior Court in that county

and heard by *Robinson, J.;* judgment *pro forma,* affirming the decision of the commissioners. *No error.*

*Thomas C. Coughlin* and *Frank L. Wilder,* for the appellant (remonstrating taxpayer).

*Homer S. Cummings,* for the appellee (the licensee).

BALDWIN, C. J. The sole ground of the appeal to this court is that the license law (Rev. 1902, chapters 157 and 158) is void. The claim is that the sale of intoxicating liquors to be drunk as a beverage at the place of sale, is so destructive to the public health and so inherently immoral, that no law upholding it can be valid either under the Constitution of this State or of the United States.

The appellant first contends that, as the people of Connecticut, in the preamble of their Constitution, gratefully acknowledge "the good providence of God, in having permitted them to enjoy a free government," this is a recognition of God as the source of that government; that the Bible contains the "word of God"; that it condemns the use and sale of intoxicating liquors as a beverage; and therefore that the State cannot permit it on any terms.

There was a time in the early history of this Commonwealth when the Bible was, "in the case of the defect of a Law in any perticular case," a rule of political government. 1 Col. Rec. of Conn. 509. But even then it was never considered to contain any absolute prohibition of such a business as that for which the license now in question was granted. As early as 1643 it was provided by the colonial laws that no person or persons should sell wine or "strong water in any place within these libertyes, without license from the particular court or any two magistrates." 1 Col. Rec. of Conn. 100; Cf. ibid. 154. Our Code of 1650 (1 Col. Rec. 533), under the title of "Inkeepers," recited that "forasmuch as there is a necessary vse of howses of Common

Interteinement in euery Common wealth, and of such as retaile wine, beare and victualls, yet because there are so many abuses of that lawfull libberty, both by persons interteining and persons interteined, there is allso need of strict lawes and rules to regulate such an imployment." Legislation of a similar character appears in subsequent revisions of the statutes, down to the date of the adoption of our Constitution. Statutes (Ed. 1715) 123; Comp. 1808, 640; Public Acts of 1810, p. 33, Chap. VII. It had been one of the permanent features of that free government, for the enjoyment of which the people expressed in that instrument, in the language quoted, their gratitude to the good providence of God. In the face of this long history of dealing with the use and sale of intoxicating liquors as a beverage, to be drunk at the place where they are purchased, it is idle to claim that the framers of the Constitution understood or intended that anything contained in it should be regarded as prohibiting altogether the licensing of such a business. *Minor* v. *Happersett*, 21 Wall. (U. S.) 162, 175.

Our Constitution (Art. III, § 1) vests "the legislative power of this State" in the General Assembly. That power covers the whole field of legitimate legislation except so far as limitations are to be found in other provisions of this Constitution or in that of the United States.

The latter provides (Art. IV, § 4) that the "United States shall guarantee to every State in this Union a Republican Form of Government." Connecticut is therefore impliedly bound forever to maintain such a form of government. She put her legislative power in the hands of the General Assembly. She put only, because she could put only, such power of that nature as was consistent with a republican form of government. *Fletcher* v. *Peck*, 6 Cranch (U. S.) 87; *Welch* v. *Wadsworth*, 30 Conn. 149, 155. In constitutional republics, as was observed by Chief Justice Chase in a case where arguments somewhat resembling those now made at our bar were advanced, "there are, undoubtedly, funda-

mental principles of morality and justice which no legisla-
ture is at liberty to disregard; but it is equally undoubted
that no court, except in the clearest cases, can properly
impute the disregard of those principles to the legislature."
*License Tax Cases*, 5 Wall. (U. S.) 462, 469; *Loan Associa-
tion* v. *Topeka*, 20 id. 655, 663.

The General Assembly of Connecticut, under the Four-
teenth Amendment to the Constitution of the United States,
can deprive no one of life, liberty, or property, without due
process of law. Any precise and exhaustive definition of
the phrase "due process of law" has been sedulously
avoided by the Supreme Court of the United States. *David-
son* v. *New Orleans*, 96 U. S. 97, 104. It has, however, been
repeatedly declared to refer not merely to forms of legal
proceedings, but to "that law of the land in each State,
which derives its authority from the inherent and reserved
powers of the State, exerted within the limits of those
fundamental principles of liberty and justice which lie at
the base of all our civil and political institutions, and the
greatest security for which resides in the right of the people
to make their own laws, and alter them at their pleasure."
*Hurtado* v. *California*, 110 U. S. 516, 527, 535, 4 Sup. Ct.
Rep. 111, 292. It therefore embraces such a matter as
taxation by a State of personal property having a *situs* in
territory beyond its borders. *Union Refrigerator Transit
Co.* v. *Kentucky*, 199 U. S. 194, 202, 211, 26 Sup. Ct. Rep. 36.
It forbids arbitrary interference with any man's liberty of
contract. *Adair* v. *United States*, 208 U. S. 161, 174, 175,
28 Sup. Ct. Rep. 277.

But however broad the scope that has been given to the
guaranty of due process of law by such decisions as those to
which reference has been made, that there is nothing un-
republican, nor beyond the legitimate sphere of legislative
power, in the maintenance of such a system as that long
established here for governmental licenses to sell intoxicat-
ing liquors, is plain from the fact, of which judicial notice

must be taken, that most free governments have, at all periods of time, made that business a subject not of prohibition but of regulation. Either mode of treatment is equally legitimate. *State* v. *Brennan's Liquors*, 25 Conn. 278, 288; *Crowley* v. *Christensen*, 137 U. S. 86, 91, 11 Sup. Ct. Rep. 13. At common law it was a business lawful and open to any man. Our statutes do not enlarge but restrict this right. *Sopher* v. *State*, 169 Ind. 177, 81 N. E. 913.

Finally it is argued that the statute is essentially a revenue measure, though ostensibly in the interests of public police. The term "police power" has, at bottom, no other meaning than the general power of governing its people and dominions belonging to every sovereignty. *McKeon* v. *New York, N. H. & H. R. Co.*, 75 Conn. 343, 347, 61 L. R. A. 730, 53 Atl. 656. The State may properly restrict a business dangerous, if unregulated, to public morals or security, by the requirement of large license fees. *State* v. *Conlon*, 65 Conn. 478, 484, 33 Atl. 519. It is only important to distinguish between licenses issued by way of regulation and licenses issued for purposes of revenue, in the case of municipal corporations acting under legislative authority. The question then is, For what object was the authority given by the legislature? Such an inquiry is irrelevant in testing the validity of a statute of the State.

There is no error.

In this opinion the other judges concurred.